## AFFIDAVIT

I, Kelley Hoover, being duly sworn, depose and say:

I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and have been so employed for approximately fourteen (14) years.  I am a graduate of the ATF National Academy, the Federal Law Enforcement Training Center Criminal Investigator Program and have attended numerous other specialized training programs related to investigations (Narcotics, Asset Forfeiture, Gangs, Organized Crime, Conspiracy, etc).  My duties as an ATF Special Agent are to investigate violations of federal law relating to alcohol, tobacco, firearms, arson, explosives and narcotics, including federal firearms laws in violation of 18 U.S.C. § 922(g) and federal narcotics laws in violation of 21 U.S.C. § 841(a)(1).  I am a Federal Law Enforcement Officer as defined in Rule 41 and am authorized by Federal Law to request a search warrant.

Over the course of my career, I have worked ~~on~~ in excess of two hundred (200) cases involving federal firearms and/or narcotics violations.  As a result of my training and experience as an ATF Special Agent, I am familiar with federal criminal law and know that pursuant to 18 U.S.C. § 922(g)(1), it shall be unlawful for any person who has been convicted of a felony crime to possess a firearm which has traveled in interstate commerce; and Title 21 U.S.C. § 841(a)(1), it shall be unlawful to possess with intent to distribute a controlled substance.  Because of my training and experience, and through consultation with other experienced investigators and legal counsel, I know or have reason to believe the following:

    a.  That persons possess on their person, and in their residences, as well as other real property and vehicles over which they have dominion and control, documents which indicate their occupancy and/or ownership, such as personal mail, receipts, checkbooks, personal identification documents, notes and other correspondence, utility bills, financial documents, keys, photographs, leases, mortgage bills,

1

vehicle registration information, ownership warranties, telephone answering machine introductions, photographs, and undeveloped photographic film containing photographs (when developed) of themselves occupying the property and vehicles;

b.  That when determining whether a delay in obtaining a search warrant makes affidavit information fatally stale, courts look not only to the length of the delay, but also to such things as the nature of the criminal activity involved (whether continuous and ongoing or infrequent) and the kind of property that is to be searched for (whether perishable or enduring);

c.  It is common for individuals who have firearms legally and illegally in their possession to maintain and/or keep said firearms at their residence on their property and/or in vehicles as areas of secure concealment.

d.  It is common for individuals who are in possession of firearms to maintain items used for maintenance of said firearms i.e. cleaning items, lubricating oil, and other items used for cleaning firearms.

e.  It is also common for individuals who are in possession of firearms to maintain ammunition for said firearms, books, magazines, and paperwork related to firearms, purchase and/or disposition of firearms

f.  It is common for individuals who are in possession of firearms illegally to hide firearms at other locations in an effort to conceal the fact that they are committing a violation of the law.

g.  That it is common for drug traffickers to store narcotics, narcotics proceeds, and records related to the trafficking of narcotics at their residences and/or businesses and at the residences and/or businesses of their relatives and co-conspirators, or at other locations and/or vehicles controlled by them;

h.  That narcotics traffickers must maintain on-hand, large amounts of U.S. currency in order to maintain and finance their on-going narcotics business;

i.  That drug traffickers maintain books, records, receipts, notes, ledgers, airline

2

tickets, money orders, passports and other papers relating to the procurement, distribution and storage of controlled substances or the proceeds of distribution of controlled substances including ATM receipts, travel records, cellular telephones, vehicle titles, property leases, property purchase agreements, financial transaction receipts, banking records and tax documents.  These records include the telephone numbers of sources and customers, the amount of controlled substances distributed to various customers, along with running totals of debts owed by these customers. They also maintain paraphernalia utilized to cut and package-controlled substances.  These aforementioned items are commonly maintained in locations to which narcotics traffickers have frequent and ready access, i.e. homes, garages, outbuildings on the property, businesses and automobiles;

j.   That it is common for large-scale narcotics traffickers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences and/or businesses for ready access and to conceal them from law enforcement authorities;

k.   That persons involved in large-scale drug trafficking operations conceal within their residences and/or businesses caches of drugs, large amounts of currency, financial instruments, precious metals, automobile titles, jewelry and other items of value and/or proceeds of drug sales and evidence of financial transactions, or spending of large sums of money acquired from engaging in drug trafficking activities and that these items are also secured in safety deposit boxes;

l.   That when drug traffickers amass large amounts of proceeds from the sales of drugs, the traffickers attempt to legitimize these profits.  That to accomplish these goals, drug traffickers utilize domestic and foreign banks and/or financial institutions and their attended services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, "shell" corporations and business "fronts".  Records of these activities are commonly kept in the drug traffickers' residences and/or businesses, and in areas over which the drug traffickers exercise

dominion and control;

m. That drug traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses and/or telephone numbers of their criminal associates in drug trafficking;

n. That during drug transactions, traffickers take or cause to be taken photographs of themselves, their associates, their property, and their product. That these traffickers usually maintain these photographs at their residences and/or other properties that they control;

o. That drug traffickers commonly use electronic equipment to aid them in their drug trafficking activities. This equipment includes, but is not limited to, digital display pagers, mobile telephones, speed dialers, electronic telephone books, electronic date books, computers, money counters, electronic surveillance equipment, eavesdropping equipment, police radio scanners, items that detect electronic equipment utilized by law enforcement and portable communication devices;

p. Based upon the Affiant's experience in narcotic investigations, it is known that persons who traffic in controlled substances frequently maintain firearms to protect both the controlled substances and proceeds derived from their sale from other narcotics traffickers and law enforcement authorities.

This affidavit is submitted in support of an application for a search warrants to search for and seize evidence of drug trafficking, in violation of 21 U.S.C. § 841(a) (1), and illegal possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g) (1), at Triple Crown Apartments, located at 3501 Pimlico Parkway, specifically Apartment #88, a residence located in Lexington, Fayette County, Kentucky, and (2) at 2105 Coriander Lane, a residence located in Lexington, Fayette County, Kentucky, both of which are located in the Eastern District of Kentucky. I also seek permission to search any safes, lock-boxes, or similar containers found inside the residence, or any attached garages, outbuildings, vehicles, trailers, sheds, storage units, and appurtenances, located

4

at the residence/apartment complex common area identified as being under the care and control of Stanley Jackson III.  See Attachment A, incorporated herein, for further description of the places to be searched.  See Attachment B for further description of items to be search for and seized.

This affidavit is offered only to establish probable cause and is not intended to be a complete presentation of all the facts of the investigation. The information contained in this Affidavit is based upon my personal investigative knowledge, my consultation with other ATF agents, my review of certain records and documents, interviews of confidential informants, and information provided by other law enforcement officers employed by the Lexington Police Department (LPD) who participated in this investigation.

The property 3501 Pimlico Parkway, Apartment #88, Lexington, KY, is described as a ground floor level apartment located in Building H of Triple Crown Apartments and is a multi-unit apartment building that is made of brown brick and tan vinyl.  Apartment #88 is the ground floor rear apartment of Building H and has a concrete pad recessed patio area that is partially boxed in, as the ground level of building H is accessed by going downstairs to access the ground floor breezeway.  There is one door for Apartment #88 that is clearly marked, located off the Building H breezeway.  This door has the number 88 clearly labeled on the door.  There is a second door, a sliding glass patio door, that is located off the recessed patio for Apartment #88, at the rear of Building H.  This residence is located on Pimlico Parkway.  Based on my participation in this investigation, the residence at 3501 Pimlico Parkway, #88, Lexington, KY is readily identifiable to me.

The property at 2105 Coriander Lane, Lexington, KY is described as a 2-story single family dwelling that is made of tan vinyl siding and has black shutters with the number 2105 clearly marked on white front porch post to the left of the front door.  The residence has a small concrete pad front porch and a front facing attached garage with a 2-car garage door that is tan in color.  There is one (1) front door on the residence, which is blue in color and is located off the front porch, which is on the left side of the garage.

5

The backyard of the property is surrounded by a wooden privacy fence.  This residence is located at the end of the cul-de-sac on Coriander Lane.  Based on my participation in this investigation, the residence at 2105 Coriander Lane, Lexington, Kentucky is readily identifiable to me.

## INVESTIGATION

1.     Your Affiant began an investigation into armed drug trafficking by Stanley Jackson III, male/black, date of birth (DOB) 09/24/1966, in November 2020. In November 2020, ATF received information from a known and reliable confidential source (hereinafter referred to as CS 1), that an individual by the name of Stanley "Dirty Red" Jackson, a resident of Fayette County, in the Eastern District of Kentucky, was involved in narcotics trafficking and the illegal possession of firearms.  CS1 is known to Your Affiant and has proven to be reliable and credible in other investigations.  Further, CS1 advised agents that Jackson was living in a residence off Winchester Rd., on Coriander Lane, with his significant other, identified as Tammy Morton.  CS1 further advised agents that in November and December 2020, he/she observed Jackson conduct multiple drug transactions and observed Jackson in possession of several firearms.  The drug transactions occurred at the Coriander Lane residence and from a vehicle, identified as a beige colored Dodge Ram 1500 truck.  Jackson was observed by CS 1 to be in possession of firearms beginning in December 2020 at the Coriander Lane residence. Agents were able to locate Facebook pages for Tammy Morton and Stanley Jackson and confirmed their identities with the confidential source.  Your Affiant used an unmarked Kentucky Operator's License (OL) photo of Stanley Jackson (OL # J15750697) to show CS 1, who identified Jackson as the individual known by CS 1 to be violating Federal Firearms and Narcotics Laws.  Your Affiant or other ATF representatives utilized

NLETS [1], to obtain this photograph of Stanley Jackson.  Your Affiant located a Kentucky Operator's License (OL) for Tammy Morton (OL # S94475558) and confirmed that the individual photographed was the same individual pictured in the Facebook Page for Tammy Morton, as identified by CS 1.  Your Affiant or other ATF representatives, utilized NLETS, to obtain this photograph of Tammy Morton.  CS 1 rode with Your Affiant and provided directions, leading Your Affiant to 2105 Coriander Lane, in Lexington, KY.  CS 1 advised that 2105 Coriander Lane is the residence where Jackson III resides with Morton.  Your Affiant later confirmed that the address listed on both the KY OL for Jackson and Morton is 2105 Coriander Lane, Lexington, KY.  Your Affiant or other ATF representatives further utilized the Kentucky Court of Justice database (KY Courtnet) to query the information for Jackson as listed on his KY OL. This query revealed that Jackson's name is Stanley Jackson III.

2.      In January 2021, while agents were still investigating the information provided in November 2020, another known and reliable narcotics confidential source (hereinafter referred to as CS 2) independently provided information regarding the drug trafficking activity of Stanley "Dirty Red" Jackson.  CS2 advised agents that during the past couple of years, he/she had observed Jackson distribute quantities of crack cocaine, heroin, fentanyl, and methamphetamine.  This source was also aware that Jackson often conducted transactions from the Coriander Lane residence, at an apartment at Triple Crown Apartments in Lexington, Kentucky that was rented by a white/female named "Angie", and from a Dodge 4-door pickup.  CS 2 reported seeing Jackson with narcotics at the Coriander Lane residence as recently as October of 2020 and earlier that same year.  CS 2 recalled seeing a black duffle bag inside the garage of this residence, stating that Jackson kept narcotics and money in this bag. At the time CS 2 provided this

---

[1] NLETS, the National Law Enforcement Telecommunication System, is an information sharing network that is utilized by law enforcement to share information, particularly information related to vehicles, driving records and drivers' licenses.

information, he/she reported seeing Jackson with narcotics at the apartment at Triple Crown Apartments on January 10, 2021, describing that he had the narcotics in a black and red bag in a bedroom in this apartment. CS 2 is also aware that Jackson carries a black box with him in which he keeps his narcotics. CS 2 described the black box as looking like a keyed lock box and being made of thin metal. Further, CS2 advised agents he/she had seen Jackson in possession of firearms, specifically on his person on January of 2021 and in his Dodge pickup truck in November or December of 2021. Your Affiant provided CS 2 with an unmarked Kentucky Operator's License (OL) photo of Stanley Jackson III (OL # J15750697), who identified Jackson III as the individual known by CS 2 to be violating Federal Firearms and Narcotics Laws. Your Affiant provided CS 2 with an unmarked Kentucky Operator's License (OL) photo of Tammy Morton (OL # S94475558), who identified Morton as the woman who had children with Jackson III and who resided at the Coriander Lane address where he/she has observed Jackson conducting narcotics transactions. Later in January, 2021, CS 2 advised Your Affiant that the specific Apartment being utilized by Jackson III to conduct narcotics transactions from is Apartment #88.

3.      On January 16, 2021, CS 2 contacted Your Affiant and provided the following information: CS 2 had gone to Triple Crown Apartments, Apartment #88, to meet with Jackson on that day. While at the apartment, CS 2 observed Jackson sell narcotics on approximately ten (10) separate occasions. The narcotics he sold on this date included heroin, crack cocaine and methamphetamine. CS 2 noted that he had a firearm, a pistol, on his person, and that there were a "few" more pistols located in an open closet in plain view.

4.      On February 1, 2021, ATF and Lexington Police Department Investigators utilized this same reliable confidential narcotics informant, who hereinafter after will be referred to as CI, to conduct a monitored, recorded controlled purchase of a quantity of suspected

8

heroin from Jackson III in the front seat of Jackson III's Dodge truck, which was located in Lexington, KY.  Prior to this controlled purchase being conducted, Lexington Police Department (LPD) Narcotics Detective Hazelwood conducted surveillance at Triple Crown Apartments, a location where Jackson III was suspected to be staying, in Apartment #88.  Detective Hazelwood was provided with a vehicle description of a truck that Jackson III was known to drive, and located a vehicle matching this description parked in a visitors parking area near Apartment #88.  From a police database, the registration for this vehicle, a 2007 white Dodge pickup truck bearing KY tag "252 ZNJ", was found to be a current registration, registered to Tammy Morton and Stanley Jackson at 2105 Coriander Lane, Lexington, Kentucky.  While CS1 identified Jackson's vehicle as a "beige Dodge Ram", affiant confirmed that the Dodge pickup truck bearing tag "252 ZNJ" is the same vehicle as identified by CS1.  Detective Hazelwood, who had been provided with a photograph of Jackson III prior to initiating surveillance, observed Jackson III exit the rear of apartment building H, where Apartment #88 is located and approached this same Dodge truck.  Detective Hazelwood further observed Jackson III enter the truck and drive away from the apartment complex parking lot.  Detectives Hazelwood and Johnson continued surveillance on Jackson III as he travelled directly from Triple Crown Apartments to the meeting location where he had directed the CI to in Lexington, Kentucky.  Jackson III was not observed meeting with any other individuals before meeting with the CI. Prior to the arranged meeting with Jackson III, the CI was searched, and no contraband was located.  The CI was provided with recording device and police buy money.   The CI was then surveilled by ATF Special Agents as the CI travelled from a predetermined meeting location to the area where the CI met with Jackson III.  The CI was observed parking next to Jackson III's Dodge truck.  After parking, the CI was observed getting into the front passenger seat of Jackson III's vehicle.  The CI was then observed by surveillance units getting out of the target vehicle and getting back into his/her vehicle.  The CI then departed the meeting location area.  Visual contact with the CI was maintained by surveillance units

9

and the CI was followed back to the pre-determined meeting location.  The CI relinquished to Your Affiant two (2) separate knotted baggies of suspected heroin that the CI had just purchased from Jackson III in his Dodge truck.  The CI was once again searched, and no contraband was located.  The CI was debriefed, and the recording device provided to law enforcement.  Your Affiant has viewed the recording and it corroborates the debriefing of the CI.   As the CI returned to the pre-determined meeting location, additional surveillance units continued observing Jackson III and his Dodge truck after this controlled purchase was completed.  They noted that after the CI exited Jackson III's vehicle, another individual got into the front passenger seat for a short time.  After this other individual exited Jackson III's truck, Jackson III drove away from the meeting location.  Based upon my training and experience, I believe this is consistent with that of another narcotics transaction in the Dodge truck. Jackson III was surveilled as he travelled in his same vehicle, ultimately turning onto Coriander Lane.  A few minutes later, surveillance units confirmed that Jackson III's truck was parked in front of 2105 Coriander Lane.  The suspected narcotics purchased on this date were submitted to the Kentucky State Police Laboratory for analysis.  One (1) of the two (2) submitted baggies of suspected heroin was analyzed by the Kentucky State Police lab.  This substance was found to contain 6.784 grams of fentanyl, a Schedule II narcotic.

5.     On February 1, 2021, following this controlled purchase, the CI located a female on Jackson III's Facebook page by the name of Angie Gollar, identifying her as the renter of Apartment #88 at Triple Crown Apartments, where JACKSON often conducts transactions.   Your Affiant provided the CI with an unmarked Kentucky Operator's License (OL) photo of Angela Gollar (OL # G97950912), who identified Gollar as "Angie", the white/female known by the CI as the renter of Apartment #88.  Your Affiant later utilized the database TransUnion (TLOxp), a database used by law enforcement, to run an address report on Gollar.  This query revealed that the address 3501 Pimlico Parkway, Apartment #88, Lexington, KY, has been associated with

Gollar's name from June of 2020 through January of 2021.

6.      On February 1, 2021, following this controlled purchase, the CI met with Jackson III in Apartment #88 at Triple Crown Apartments. While meeting with Jackson III, the CI observed him in possession of two (2) firearms.  The CI described one firearm as a handgun that Jackson III took out of a black duffle bag along with the narcotics and scales.  The CI observed him showing this firearm to someone who was purchasing narcotics from him.  The CI also advised he/she observed that Jackson III had a black handgun tucked into the back waistband of his pants.

7.      On February 3, 2021, CS 1 met with JACKSON III at Triple Crown Apartments, located in Lexington, KY.  While meeting with JACKSON III at this location, CS 1 learned from him that he was staying there with a white/female who rented the apartment.  CS 1 noted that while in the apartment at Triple Crown Apartments, he/she observed two (2) closed black plastic handgun cases and a blue bag that the CI observed Jackson III putting money into.

8.      Your Affiant received additional information from the CI concerning time that he/she spent with Jackson III on February 5, 2021.  On this occasion, Jackson III instructed the CI to come to 2105 Coriander Lane, where Jackson III resides at times with Tammy Morton.  While at the residence, the CI noted that Jackson was contacted on his cell phone about narcotics on a couple of separate occasions.  The CI was aware of this because of being in the room with Jackson III and because after the calls/texts, he took narcotics and scales out of his black duffle bag and weighed out quantities of narcotics before leaving with the narcotics.  The CI stated that each time this occurred, Jackson III told him/her that he had to run to meet with someone and took the weighed-out narcotics with him.  Jackson III left the residence and returned to it each time in the previously identified Dodge Truck.  After returning from a final sale, the CI left the residence at the same time that Jackson III did.  The CI noted that he/she met with

11

Jackson III at the residence, arriving at the same time, and observed that he arrived in his Dodge truck and carried a black duffle bag into the garage with him.  When the CI and Jackson III both left the residence in their separate vehicles, the CI observed that Jackson III put the black duffle bag containing the scales and narcotics on a shelf in the garage before leaving the residence without it.

9.      On February 28, 2021, the CI contacted Your Affiant and advised that he/she saw Jackson III on this same date in the parking lot of Triple Crown Apartments.  The CI noted that Jackson III had a handgun tucked into the back waistband of his pants, which the CI was able to see when Jackson was moving items in his truck and his shirt raised up, exposing the portion of the firearm that was sticking out of his pants.  The CI also observed that Jackson III had a black duffel bag with him, which appeared to be the same duffel bag the CI has seen him keep narcotics in previously.

10.    The CI also provided Your Affiant with information concerning an interaction he/she had with Jackson III on March 1, 2021.  On this date, the CI had contact with Jackson III, and he told him/her to come meet him in the Triple Crown Apartment Complex parking lot.  Upon pulling into the parking lot, the CI noted that Jackson III was in his Dodge truck, sitting in the driver's seat of his truck and was alone.  While with Jackson III, the CI observed him making narcotics sales including methamphetamine and heroin, to approximately ten (10) separate people from his truck. Jackson III had his black lock box in the front seat area of the truck and the CI was able to see him access the contents of the lockbox when he was making sales.  The CI was able to observe that Jackson III had several baggies of narcotics in the lockbox along with digital scales.  Jackson III was receiving calls and text messages on his cell phone for narcotics orders and was then weighing the narcotics in front of the CI and packaging them for each customer to come pick up.

11.    Following this, on March 10, 2021, the CI saw Jackson III when he was parked on a residential street in Lexington, KY.  The CI noted that he was driving his Dodge truck and that he had a female passenger in his front seat who was smoking crack cocaine. The CI observed that while parked on this residential street, he sold heroin to three (3) separate individuals.  He/she was able to see that he sold one (1) gram of heroin to a customer, two (2) grams of heroin to another customer and an unknown amount of heroin to a third customer.  The CI observed that Jackson III had the black lock box in the front of the truck and took a larger baggie of heroin and digital scales out of the box before weighing out the sales and packaging them for his customers.  At one (1) point while parked on the street, Jackson III exited his truck to do something in the bed area of his truck.  When he did so, the CI observed that he had a handgun tucked into his back waistband.

12.    From March 24, 2021 to March 31, 2021, Your Affiant and Detectives with the Lexington Police Department conducted surveillance at Triple Crown Apartments, 3501 Pimlico Parkway.  On March 24, 2021, Your Affiant observed Jackson III exiting the patio area of Apartment #88 with a grey colored backpack.  Your Affiant noted that Jackson III appeared to be talking on his phone and approached his truck in the parking lot.  Jackson III accessed the interior of his vehicle and the toolbox located in the truck bed while still talking on his cell phone.  He relocated his truck to a different parking space on two (2) separate occasions before beginning to work on the front push bar attached to the truck.   While working on his truck, Your Affiant observed a greyish colored Ford car pull into the parking lot of Triple Crown Apartments and back into a parking spot located directly next to Jackson III's truck.  Jackson III accessed the passenger compartment area of his vehicle, then approached the driver's door of the Ford car and interacted with the driver through the driver's window.  This interaction lasted for approximately four (4) minutes, at which point the driver of the Ford pulled out of his parking spot and exited the apartment complex parking lot.  Based upon my

13

training and experience, I believe this is consistent with that of a narcotics transaction. The surveillance involved other observations related to the investigation, but this was the only observation regarding the target vehicle conducting a suspected narcotics transaction.

13.      On April 1, 2021, ATF and Lexington Police Department Investigators utilized the reliable confidential narcotics informant, CI, to conduct a monitored, recorded controlled purchase of a quantity of suspected heroin from Jackson III in the front seat of Jackson III's Dodge truck, which was located in Lexington, KY.  Prior to this controlled purchase being conducted, Lexington Police Department (LPD) Narcotics Detective Hart conducted surveillance at Triple Crown Apartments.  Detective Hart was previously provided with a vehicle description of Jackson III's truck, and located the vehicle in the parking lot, parked in the vicinity of Apartment #88.  Detective Hart was also previously provided with a photograph of Jackson III and observed him exit the apartment building where Apartment #88 is located and approach his Dodge truck. Detective Hart observed Jackson III enter the truck and drive away from the apartment complex parking lot.  Lexington Police Department Detective McCown along with ATF Special Agent Caudill continued surveillance on Jackson III as he travelled directly from Triple Crown Apartments to the meeting location to where he had directed the CI in Lexington, KY.  Jackson III was not observed meeting with any other individuals before meeting with the CI. Prior to the arranged meeting with Jackson III, the CI and vehicle were searched for contraband and none was located.  The CI was provided recording device and police buy money.  The CI was then surveilled by ATF Special Agents as the CI travelled from a predetermined meeting location to the area where the CI met with Jackson III.  The CI was observed parking and waiting for Jackson III to arrive.  After Jackson III arrived in his truck, the CI was observed getting into the front passenger seat of the truck.  The CI was then observed by surveillance units getting out of the target vehicle and getting back into his/her vehicle.  The CI departed the meeting location area

14

and visual contact with the CI was maintained by surveillance units as the CI was followed back to a pre-determined meeting location.  The CI relinquished to Your Affiant a knotted baggie of suspected heroin that the CI had just purchased from Jackson III in his Dodge truck.  Once again, the CI and vehicle were searched with no contraband being located.  The CI was debriefed regarding the controlled purchase.  Your Affiant has reviewed the recording and it is consistent with the CI's debriefing, corroborating the purchase of narcotics from Jackson. The suspected narcotics purchased on this date are being submitted to the Kentucky State Police Laboratory for analysis.  Based upon my training an experience, the packaging of the substance, and the color and consistency of the substance, I believe the substance to be heroin and/or fentanyl.

14.    On the evening of April 4, 2021, the CI went to meet with Jackson III at Triple Crown Apartments and interacted with Jackson III for a short period of time, during which he sold pre-packaged narcotics (heroin) to two (2) separate vehicles that pulled into the parking lot.  When asked if Jackson was communicating on his cell phone prior to making these sales, the CI responded that he was.  The CI noted that Jackson III was using a black smart phone, but he/she was unable to see if there was a dark colored case on the phone or not.

15.    On April 6, 2021, the CI met with Jackson III in the parking lot of Triple Crown Apartments.  While speaking with him outside, Jackson III provided the CI with access to his truck.  While accessing the truck from the driver's door, the CI noted that there was no firearm tucked into the door pocket where the CI knew Jackson III to regularly keep a firearm.  As a result, the CI felt under the driver's seat and felt what the CI knew to be a firearm.  The CI specifically described what he/she felt as being a pistol.

16.    On April 9, 2021, the CI met with Jackson III in the parking lot of Triple Crown Apartments.  While meeting with Jackson III, he/she observed him receiving text

15

messages and telephone calls on his cell phone, which the CI described as a black or dark colored phone.  The CI was unable to determine the brand of the phone but thought it was in a dark colored case.  When receiving some of these phone calls, the CI heard Jackson III telling the person on the other end of the phone to come "out Creek" or "to the apartment".  A short time after receiving each call, the CI noted that someone would pull into the apartment complex parking lot and Jackson III would remove pre-packaged narcotics from his pocket to sell to them.  The CI observed this same behavior after Jackson III received text messages on this same cell phone.  The CI recalled Jackson III selling narcotics to approximately ten (10) separate people while he/she was present. The CI also noted that Jackson III was wearing a tight shirt, which allowed the CI to clearly see that he had a black or dark colored handgun tucked into his back waistband.

17.    On April 15, 2021, the CI went to meet with Jackson III in the parking lot of Triple Crown Apartments.  The CI spoke with JACKSON III for a short period of time in the parking lot, during which Jackson III used his phone to ask "Siri" a question. Because he was asking "Siri" questions, the CI believed Jackson III to have an Iphone. The CI observed Jackson III receive a few calls on his cell phone.  After a couple of these calls, people pulled into the apartment complex to purchase narcotics from him. Jackson III already had these narcotics, on one (1) occasion methamphetamine and on one (1) occasion heroin, packaged in his pocket and ready to be sold.

18.    During the investigation, Your Affiant became aware that prior to April 20, 2021, Jackson III and his truck frequented the area of 2064 Teresa Drive.  On April 20, 2021 at approximately 4:00 p.m., Your Affiant confirmed that Jackson III and his truck were located in front of 2064 Teresa Drive, and noted that Jackson III appeared to be working on the exterior of the residence.  Based upon the confirmation, Your Affiant initiated surveillance on St. Christopher Drive near the crosswalk area, near 2064 Teresa Drive. This crosswalk area on St. Christopher Drive is located one street over from St Teresa

Drive, and behind 2064 St. Teresa Drive.  At approximately 4:12 p.m., Your Affiant observed a vehicle bearing KY tag "665 TVL" park on St. Christopher directly next to the crosswalk.  A white/female with long brown hair, the only vehicle occupant, exited the vehicle with money in her hand and was observed walking up the walking path towards 2064 St Teresa.  At approximately 4:13 p.m., Your Affiant drove down St. Christopher past the walking path and observed the female from the aforementioned vehicle standing with Jackson III on the walking path.  Your Affiant noted that Jackson III had his arm reaching towards the female and appeared to be handing something to her.  At approximately 4:14 p.m., Your Affiant observed the same white/female exit the alley, get back into her car, and drive away.  On this same date at approximately 4:37 p.m., Your Affiant observed a grey car with Kentucky Veteran Tag "4572 JA", drive down St. Christopher and park next to the crosswalk.  A white/male with a dark colored beard appeared to be the only occupant of the vehicle.  At approximately 4:39 p.m., an unknown white/female was observed walking from the walking path to the driver's door of this grey car.  The white/female interacted with the driver through the driver's window briefly, leaning toward the vehicle and sticking her hand into the car through the window.  At approximately 4:39 p.m., this female walked away from the car and back up the walking path towards 2064 St. Teresa.  At this same time, the grey car drove away.  At approximately 4:40 p.m., Your Affiant drove down St. Christopher past the walkway and observed the unknown white/female standing with Jackson III in the walkway.  On this same date at approximately 4:54 p.m., Your Affiant observed a beige car bearing KY Tag "664 XZA" pull down St. Christopher and park near the crosswalk.  A white/female with long dark hair and a large dog were the only occupants of the vehicle.  The white/female exited the vehicle and at approximately 4:55 p.m., this female was observed walking up the walkway towards 2064 St. Teresa.  At approximately 4:58 p.m., this same female was observed returning from the walkway getting into her car and driving away.  Based upon my training and experience, I believe this is consistent with that of narcotics transactions.

17

19.     On April 28, 2021, ATF and LPD utilized the CI to conduct a monitored, recorded controlled purchase of a quantity of suspected heroin from Jackson III at 3501 Pimlico Parkway, Apartment #88, Lexington, KY.  Prior to this controlled purchase taking place, LPD Detective Johnson conducted surveillance at Triple Crown Apartments.  Detective Johnson was provided with a vehicle description of the white Dodge pickup truck that Jackson III was known to drive, and located this vehicle in the parking lot of Triple Crown Apartments, in the vicinity #88, parked directly next to a red Oldsmobile Bravada, known to be under the control of Jackson III.  While conducting surveillance and prior to the CI arriving at the apartment, Detective Johnson observed three (3) separate vehicles pull into the parking lot of Triple Crown Apartments and an occupant of each vehicle walk down the sidewalk behind Buildings H (where Apartment #88 is located) and I.   Each of these individuals ultimately entered the breezeway of Building H, directly next to where Apartment #88 is located and approached the front door of this Apartment.  Detective Johnson noted that after entering this breezeway and approaching the front door of Apartment #88, each of these individuals were out of view for short periods of time before exiting and returning to their vehicles.  Detective Johnson noted, based upon his training and experience, that each of these individual's activity was consistent with them purchasing narcotics and leaving.  Prior to the arranged meeting with Jackson III, the CI and vehicle was again searched for contraband and no contraband was located.  The CI was provided recording device and police buy money. The CI was then surveilled by ATF Special Agents as the CI travelled from a predetermined meeting location to Triple Crown Apartments.  The CI made contact with Jackson III via telephone on his cell phone, (859) 229-6258, and Jackson III advised him/her to come to the "hallway door".  The CI, who had been parked since pulling into the parking lot, was observed exiting the vehicle and walking along the sidewalk and into the breezeway of building H next to Apartment #88.  The CI could be heard by surveillance units as he/she knocked on the door and could then be heard making contact

18

with Jackson III.  A short time later, the CI was observed by Detective Johnson exiting Apartment #88 and walking along the sidewalk back to their vehicle.  The CI was visually surveilled by ATF Special Agents as he/she travelled to a pre-determined meeting location to meet with Agents.   The CI relinquished to Your Affiant a knotted baggie of suspected heroin that the CI had just purchased from Jackson III in Apartment #88.   The CI and vehicle were searched with no contraband being located.  The CI provided a briefing and during the briefing noted that Jackson III had two (2) separate cell phones that looked identical sitting next to him in the apartment.  Your Affiant has reviewed the recording of the controlled purchase and believes it to be consistent with the CI debriefing and corroborates the sale of narcotics by Jackson.  The suspected narcotics purchased on this date were submitted to the Kentucky State Police Laboratory for analysis and found to contain 1.030 grams of fentanyl and cocaine, both Schedule II narcotics.

20.    On or about May 1, 2021, the CI ran into Jackson III when he was out in Lexington, KY, and was driving a black Hyundai car with stickers on the back of it.  The CI interacted with Jackson III briefly by his car and observed his black lock box in the car in which he keeps narcotics.  Later on this same date, the CI met with Jackson III at Triple Crown Apartments, Apartment #88, and observed him with the black lockbox sitting on the kitchen table in front of him with digital scales sitting next to the black lockbox.  The CI observed him taking orders for narcotics including methamphetamine, heroin, and crack cocaine from approximately four (4) or five (5) separate people via telephone calls.

21.    On or about May 2, 2021, the CI again ran into Jackson III when he was out in Lexington, KY and was driving this same black Hyundai car.  The CI interacted with Jackson III briefly by his car and observed that he had his black lock box in the car in which he keeps narcotics.  The CI learned that Jackson III had purchased this small

black Hyundai with stickers on the back of it, which he was driving in addition to his truck.

22.    On May 4, 2021, your Affiant travelled to Triple Crown Apartments in an effort to identify Jackson III'S new vehicle.  Upon arrival, Your Affiant located a small black Hyundai car, matching the description of Jackson III'S new vehicle, parked in the visitors parking area near the dumpsters in the parking lot located directly behind buildings H and I.  Your Affiant identified the license plate of this vehicle as KY Tag "993 YRY".  On this same date, ATF personnel ran a vehicle registration query on this vehicle.  The result of this vehicle query in NLETS showed that the vehicle was registered in Jackson III's name on April 30, 2021 at the address of 2105 Coriander Lane, Lexington, KY.  Your Affiant is aware that Jackson III had been experiencing continuous mechanical issues with his Dodge pickup truck prior to when he obtained this Hyundai automobile.  At times this pickup truck prevented Jackson III from being mobile, resulting in the need for him to obtain a new vehicle.

23.    On May 6, 2021, Your Affiant travelled to Triple Crown Apartments for the purpose of conducting surveillance. While conducting surveillance, Your Affiant noted that Jackson III accessed the black Hyundai bearing KY Tag "993 YRY" on several occasions.  Jackson III was also observed removing a bag from the trunk area of the black Hyundai and approaching a maroon Oldsmobile Bravada bearing KY tag "115 CKM" in the parking lot.  Your Affiant observed Jackson III using keys which he had on his person to unlock the driver's door of the Oldsmobile Bravada.  He placed this bag from the Hyundai in the maroon Bravada.  Your Affiant also observed Jackson III accessing his white Dodge pick-up truck.

24.    On May 7, 2021, ATF utilized the CI to conduct a controlled purchase of suspected heroin from Jackson III.  This controlled purchase took place in Apartment

#88 of Triple Crown Apartments, located at 3501 Pimlico Parkway, Lexington, KY. Prior to this controlled purchase taking place, the CI texted with Jackson III via telephone on his cell phone, (859) 229-6258 on this same date.  Also prior to this controlled purchase taking place, ATF Special Agents C. Knotts and Freeman conducted surveillance at Triple Crown Apartments.  SAs Knotts and Freeman were previously provided with a vehicle description of the white Dodge pickup truck and black Hyundai car that Jackson III is known to drive, along with the description of a maroon Oldsmobile Bravada known to be in Jackson III'S possession.  SAs Knotts and Freeman located all of these vehicles in the parking lot of Triple Crown Apartments, in the vicinity #88.  Prior to the arranged meeting with Jackson III, the CI and vehicle were searched, and no contraband was located.  The CI was provided recording device and police buy money.  The CI was then surveilled by ATF Special Agents as the CI travelled from a predetermined meeting location to Triple Crown Apartments.  The CI attempted to make contact with Jackson III with no success, but Jackson did contact the CI a short time later.  The CI answered the call on speaker phone and spoke with Jackson III about conducting a controlled purchase.  The CI then walked along the back of Building H, and entered the breezeway directly next to Apartment #88.  After disappearing from view, the CI could be heard knocking on a door.  Approximately eight (8) minutes later, the CI was observed exiting the breezeway of Building H directly next to where Apartment #88 is located and approaching their vehicle.  The CI was visually surveilled by SAs as he/she travelled to a pre-determined meeting location to meet with Agents.  The CI relinquished to Your Affiant and SA Waters a knotted plastic baggie containing suspected heroin.   The CI and vehicle were searched, and no contraband was located.  The CI was debriefed and, in the debriefing, advised Your Affiant that while conducting this transaction, Jackson III had his black metal lockbox sitting on the coffee table along with several either plastic baggies or plastic baggie scraps.  Jackson III removed a pre-packaged quantity of suspected heroin from the black lock box, laying it down on the coffee table for the CI to pick up during the transaction.

Your Affiant reviewed the audio/video recording of this controlled purchase and noted that plastic baggies and/or pieces of plastic baggies were laying on what appeared to be a table, as described by the CI.  Your Affiant further noted that the corner of what appeared to be a black, square object sitting next to the baggies was viewable at times in the recording.  The recording was consistent with the CI's debriefing and corroborates a sale of narcotics from Jackson.  The suspected narcotics purchased on this date were submitted to the Kentucky State Police Laboratory for analysis and were found to contain 1.173 grams of fentanyl and cocaine both Schedule II narcotics, along with fluorofentanyl, a controlled substance per Kentucky law.

25.    On May 8, 2021, the CI met with Jackson III at Triple Crown Apartments, Apartment #88, and observed him trafficking in narcotics.  Specifically, the CI observed him sitting at the kitchen table with his black lockbox and a pistol sitting on the table in front of him.  The CI observed Jackson III open the black lockbox while removing narcotics for customers, noting that it was full of baggies of narcotics.  The CI observed Jackson III receiving both telephone calls and text messages on one (1) of his cell phone, noting that two (2) cell phones that looked alike were sitting on the table next to Jackson III.  The CI was aware that these telephone calls pertained to narcotics after hearing Jackson III's end of the conversation and observing him removing narcotics for sale during and/or after the telephone call.  The CI was aware that these text messages pertained to narcotics after observing him removing narcotics for sale after receiving messages.   While meeting with Jackson III, the CI observed him selling narcotics to approximately four (4) separate people in the apartment and removing narcotics from his black lockbox for an additional approximately six (6) people.

26.    On May 10, 2021, the CI reported that Jackson III had left to travel to Florida on or about that same date.

27.     On May 13, 2021, the CI travelled to 2105 Coriander Lane, Lexington, KY, knowing that Jackson III was out of town, in order to see what was going on at the residence while Jackson III was out of town.  The CI described that when he/she arrived, the garage door was open.  The CI was able to walk close to the garage door when approaching the front door and observed a black duffel bag sitting on a shelf.  The CI saw that the duffel bag was unzipped, and the barrel of a firearm was sticking out of the top of the bag.  The CI noted that this black duffel bag appeared to be the same black duffel bag he/she has seen Jackson III with in the past, when he has brought narcotics to 2105 Coriander Lane.

28.     On May 15, 2021, the CI reported that Jackson III was supposed to be coming back from Florida on or about that same date.

29.     The CI reported that on the evening of May 19, 2021, he/she observed Jackson III in his black Hyundai vehicle selling narcotics to an individual in Lexington, KY.

30.     On May 20, 2021, ATF utilized the CI to conduct a controlled purchase of suspected heroin from Jackson III.  This controlled purchase took place in Apartment #88 of Triple Crown Apartments, located at 3501 Pimlico Parkway, Lexington, KY. Prior to this controlled purchase taking place, the CI spoke with Jackson III via telephone on his cell phone, (859) 229-6258 on this same date.  Also prior to this controlled purchase taking place, Lexington Police Department Detectives Hart and Hazelwood conducted surveillance at Triple Crown Apartments.  Detectives Hart and Hazelwood were previously provided with a vehicle description of the white Dodge pickup truck and black Hyundai car that Jackson III is known to drive, along with the description of a maroon Oldsmobile Bravada known to be in Jackson III'S possession. Detectives Hart and Hazelwood located all of these vehicles in the parking lot of Triple Crown Apartments, in the vicinity #88.  Prior to the arranged meeting with Jackson III,

the CI and vehicle were searched, and no contraband was located.  The CI was provided recording device and police buy money.  The CI was then surveilled by ATF Special Agents as the CI travelled from a predetermined meeting location to Triple Crown Apartments.  The CI walked along the back of Building H and entered the breezeway directly next to Apartment #88.  The CI was observed by Detective Hart making contact with Jackson III at the door of Apartment #88.  Approximately four (4) minutes later, the CI was observed exiting the front door of Apartment #88, exiting the breezeway of Building H, and approaching their vehicle.  The CI was visually surveilled by SAs as he/she travelled to a pre-determined meeting location to meet with Agents.  The CI relinquished to SA Waters a knotted plastic baggie containing suspected heroin.  The CI and vehicle were searched, and no contraband was located.  The CI was debriefed and, in the debriefing, advised Your Affiant that while conducting this transaction, Jackson III had his black metal lockbox sitting on the coffee table along with scales and plastic baggies, several of which contained narcotics.  The CI additionally noted that Jackson III had narcotics on the scales that were not yet packaged.  Jackson III layed a quantity of suspected heroin in a baggie down on the coffee table for the CI to pick up during the transaction.  Your Affiant reviewed the audio/video recording of this controlled purchase and noted that there were plastic baggies, money and what appeared to be scales with unpackaged narcotics on them on what appeared to be a tray sitting on a table, as described by the CI.  Your Affiant further noted that next to Jackson where he was sitting was a backpack like bag that appeared to be black and grey in color.  The recording was consistent with the CI's debriefing and corroborates a sale of narcotics from Jackson.[2]  The suspected narcotics purchased on this date are being submitted to the Kentucky State Police Laboratory for analysis.  Based upon my training an experience, the packaging of the substance, and the color and consistency of the

_____

[2] Subsequent to the controlled purchase, Affiant learned that the CI had potentially committed misdemeanor shoplifting several days prior to the controlled purchase.  Based upon my discussions with officers from the Lexington Police Department, I do not believe that the committed offense impacts the reliability and credibility of the CI during this investigation.

24

substance, I believe the substance to be heroin and/or fentanyl.

31.    As was previously stated, Your Affiant or other ATF representatives, utilized National Law Enforcement Telecommunications System, or NLETS, to obtain driver's license information for Jackson III, Tammy Morton, and Angela Gollar during the course of this investigation.  Your Affiant and/or other ATF representatives during the course of this investigation additionally utilized NLETS to confirm vehicles registered to Jackson III.  It was confirmed through NLETS that Jackson III has two (2) vehicles currently registered in his name, a 2007 white Dodge Pickup Truck bearing KY Tag "252 ZNJ" and with VIN - 1D7HU18247J614014 and a 2007 black Hyundai bearing KY Tag "993 YRY" and with VIN - KMHCM36C77U033578, both of which are registered to him at 2105 Coriander Lane, Lexington KY.  Your Affiant and/or other ATF representatives during the course of this investigation further utilized NLETS to confirm the vehicle registration status as expired for a 2003 red Oldsmobile bearing KY Tag "115 CKM" and with VIN – 1GHDS13S832334102 in which Stanley was observed accessing.  This vehicle was last registered to a Carolyn Frederick on 1/21/2020 at 208 Martin Drive, Richmond, KY, and the registration expired on 06/30/2020.  Your Affiant has utilized NLETS throughout her career.  Through this use, Your Affiant has found that the information obtained via queries of the system is reliable.

32.    Your Affiant has reviewed records received from Fayette County Circuit Court, specifically in criminal case number 17-CR-593.  In this case, Stanley Jackson III, DOB: 09/24/1966, SSN- XXX-XX-0443, pled guilty to Possession of a Controlled Substance (Class D felony) on March 23, 2018.  Your Affiant knows that based on the aforementioned felony conviction that Stanley Jackson III, DOB: 09/24/1966, SSN: 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, is prohibited from possessing firearms and/or ammunition under Title 18, United States Code, Section 922(g)(1).

33.     Based upon the information provided by the confidential sources, the observations made by law enforcement during this investigation, and the controlled purchases of narcotics from Jackson, Your Affiant believes that Stanley Jackson III is in possession of multiple firearms both at the residence of Angela Gollar, 3501 Pimlico Parkway, #88, Lexington, KY, and that he is storing firearms at the residence of Tammy Morton, 2105 Coriander Lane, Lexington, KY.   The confidential sources have reported observing firearms at Morton's residence since December of 2020, including as recently as May 13, 2021.  Additionally, on April 18, 2021, Jackson III advised CS 1 that he/she had been contacted by Tammy Morton, who told him/her that she had located a firearm that he had forgotten about in her home on Coriander Ln.  Further the confidential sources have reported observing firearms at Gollar's residence since January of 2021, including as recently as May 8, 2021.  Finally, the CI has reported throughout the investigation that Jackson is in possession of firearms on his person during the sell of narcotics.

34.     Based upon the information provided by the confidential sources, the observations made by law enforcement during this investigation, and the controlled purchases of narcotics from Jackson, your Affiant believes that Stanley Jackson III is in possession of narcotics at the residence of Angela Gollar, 3501 Pimlico Parkway, #88, Lexington, KY.  The confidential sources have reported observing narcotics at Gollar's residence since January of 2021, including as recently as May 20, 2021.

35.     Based upon the information provided by the confidential sources and the controlled purchases of narcotics from Jackson III, your Affiant believes that Jackson III is in possession of narcotics and/or firearms in his 2007 white Dodge Pickup Truck bearing KY Tag "252 ZNJ" and with VIN - 1D7HU18247J614014 and his 2007 black Hyundai bearing KY Tag "993 YRY" and with VIN - KMHCM36C77U033578, both of which are registered to him.  Jackson III has repeatedly been observed by the confidential sources during the course of this investigation with narcotics and/or

26

firearms in the white Dodge Pickup Truck.  Your Affiant has observed Jackson III in control of this truck on multiple occasions throughout this investigation, most recently on May 6, 2021.  Jackson III was also observed by the CI on both May 1 and May 2, 2021 driving his black Hyundai and with his black lockbox, which is known by the CI to contain narcotics, in the vehicle.  On May 6, 2021, Your Affiant was able to confirm that Jackson III had control over a 2003 red Oldsmobile and observed Jackson access the vehicle using a set of keys.  On this same date, Jackson III was observed removing a bag from the black Hyundai and placing it in the red Oldsmobile.  Based on Your Affiant's training, knowledge and experience, it is common for drug traffickers to store narcotics, narcotics proceeds, and records related to the trafficking of narcotics at their residences and/or at the residences of their relatives and co-conspirators, or at other locations and/or vehicles controlled by them.  It is also common for individuals who are in possession of firearms illegally to hide firearms at other locations, including in vehicles, in an effort to conceal the fact that they are committing a violation of the law.

36.    Based on the foregoing, Your Affiant believes there is now concealed evidence, more particularly described in Attachment "A," incorporated herein, that represents violations of 18 U.S.C. § 922(g) (1) and 21 U.S.C. § 841(a)(1), and located on the person of Stanley Jackson III and the residence located at 3501 Pimlico Parkway, #88, Lexington, KY, (including any vehicles of Jackson's, safes, locked boxes, duffel bags, or containers) (more particularly described in Attachment "B" and incorporated herein).  Your Affiant believes that there is now concealed evidence, more particularly described in Attachment "A" incorporated herein, that represents violations of 18 U.S.C. § 922(g)(1) in the residence located at 2105 Coriander Lane, Lexington, KY (including any outbuildings, garages, vehicles of Jackson's, safes, locked boxes, duffel bags, or other containers) (more particularly described in Attachment "B" and incorporated herein).  The residences are in Fayette County, in the Eastern District of Kentucky.

**Signed remotely per FRCP 4.1.  See addendum.**

Kelley Hoover, Special Agent
United States Department of Justice,
Bureau of Alcohol, Tobacco, Firearms &
Explosives

Subscribed and sworn to before me on this the ___21___ day of May, 2021.

Honorable Matthew A. Stinnett, Magistrate Judge

28